18-1551 Stephen D. Knox et al. v. Schechtl Maschinenbau May it please the court, hot air applause on behalf of the appellant Metal Forming. The plaintiff and Metal Forming have split the time. Ten minutes for Metal Forming and five minutes for the plaintiff. I'd like to reserve one minute for rebuttal please. I don't want two. Normally people ask for two. I only think I'll need one. One, you got one. Thank you. We're asking that this course refers to district court decision that the manufacturer and accolade Schechtl did not purposefully avail itself of the jurisdiction of the forum state. We believe that the district court made three errors in reaching that decision. One, it made a determination that the regular flow of sales into the forum state was insignificant for the purposes of purposeful availment analysis, which this court has refuted in the Plexer decision. Two, it ignored the identification of the plaintiff's employer Cape Cod Copper, a Massachusetts corporation on the purchase order. And three, it failed to recognize the significance of the channels of communication established by Schechtl with the forum state through its instruction manual and operation manual. From 2001 to 2017, Metal Forming is the exclusive distributor of Schechtl in the United States, sold 45 machines at a value of $1.32 million to customers in the forum, as well as 274 replacement parts at a value of $176,000. Was Massachusetts one of their principal areas where their machines went? Because I think there were 17 in that period. Your Honor, Massachusetts, the territory for which Metal Forming was the distributor was all of North America. There was $100 million in sales in all of North America over the period, and $1.5 million in Massachusetts, so it was approximately 1.7% of the total sales nationally. But the regular course of sales, based upon volume and duration, is sufficient to establish purposeful availment, and in the context of this case, there's no jurisdiction. Would the location of the end of the purchaser, the state in which the purchaser was present, have been information that would have appeared on any form that the defendant would have seen? Your Honor, the purchaser didn't identify where Cape Cod Copper was located, and the record is silent on whether or not Schechtl knew where Cape Cod Copper was located, but it is our position that Cape Cod Copper, or rather, Schechtl had at a very minimum inquiry notice that its products were going to Cape Cod Copper in the Commonwealth of Massachusetts. It's important to note, Your Honor, that Schechtl, as the manufacturer, retains some control over the distribution of its products, in that it established the distribution network in which Metal Forming acted. It determined the territory, and that territory included the Commonwealth of Massachusetts. If it wanted to exclude the Commonwealth of Massachusetts, it could have done so. Additionally, Your Honor, they could have... Yes, can we go back to the purchase order? It listed Cape Cod Copper, but did not list the location. Okay, we're agreed on that. So when the machine gets shipped from Germany to Metal Forming, and then Metal Forming sends it on to Cape Cod Copper, who puts the address on for Cape Cod? Metal Forming does, Your Honor. But is there an indication that's sent to Metal Forming from Schechtl? Is that how it's pronounced, that this is the machine for Cape Cod? Well, Your Honor, this isn't a typical stream of commerce case in that... Can you answer the question before you argue? Of course, Your Honor. The way the distribution network works is, Metal Forming doesn't maintain an inventory of Schechtl products, given their cost, their complexity, and their individualistic nature. So every time Metal Forming completes a sale in the United States, it sends a purchase order to Schechtl for that specific machine. And in this case, the purchase order for the machine that's at issue in the underlying case and is alleged to have caused the injury, which was issued in 2001, that purchase order identified Cape Cod Copper as the end buyer, and Schechtl voluntarily filled that purchase order and provided the machine to Metal Forming for transmission to Cape Cod Copper. So that's a no to the judge's question? You didn't answer my question. The judge's question is, who fills out the address that would say, this is going to Massachusetts? Or, two-part, it's going to Cape Cod Copper, and second, located at? I apologize, Your Honor, I misunderstood your question. I thought you were asking how they knew that it was there. Then tell me what you thought. Answer my question. Sure. It's Metal Forming that sends the package on. They put the address of the end user on it. And does something come from the German company that identifies this machine to Metal Forming as for this particular end user? Yes, Your Honor. Because they're buying them on an individual basis, the machine was provided in response to the specific purchase order that was submitted. So when they receive that machine, it's aligned with the purchase order for which it was sent,  It's a purchase order number that gives them that information. But the information they get is just the name? The information that Shechtel received was just the name. They never get the address? They did not get the address. It's not in the record that they received the address. So if there's a warranty on the machine, or a guarantee of any sort, does Shechtel ever get any information from the ultimate user that we now own this machine and send them the warranty card? Well, Your Honor, it's not clear whether in the context of a warranty they would because the distribution agreement provides that the warranty requirements be fulfilled by Metal Forming. However, what Shechtel does do is the distribution agreement mandates that Metal Forming provide instruction and operation manuals along with the machine that Shechtel authored. And those instruction and operations manuals exclusively list Shechtel as the point of contact for replacement parts, for training, and for troubleshooting. So if the customer, the recipient of that machine, opens up the operation and instruction manual and they're having a problem with the operation of the machine and they need to call someone because the troubleshooting instructions aren't sufficient, the number that they will see is Shechtel. And if they want to buy a replacement part, the number that they will see is Shechtel's number. And why does that matter? Because... Because there's no evidence that anybody from Massachusetts called. Well, Your Honor, the record is silent on that issue. So there's no evidence in the record of that. But it's important to note, Your Honor, that that's absolutely true, that Shechtel did not deny that it's had communications with Massachusetts customers and that that goes to the clear error of the district court with respect to our request for jurisdictional discovery. I get that. Okay, but before we get to the jurisdictional discovery point, you won't need it if you have jurisdiction without it. Correct, Your Honor. So to establish jurisdiction without it, why is it significant that there is, along with a product sent by metal form, to an end user in a state that the defendant is not informed the location of, doesn't know it's in that state, that when the product is sent, it is sent with a booklet that tells the end user, you can call the home company. What is the precedent that makes that fact an important fact? Well, Your Honor, Justice O'Connor's decision in Asahi identified channels of communications with the consumer as an example of a plus factor that would provide a basis for personal jurisdiction. But I can't tell from the way she put it, is she saying that you had to have intentionally established the channel in the state, or is it just that there is a channel of communication that exists? And I don't, as I think about it functionally, why would it matter that a channel was being established if the person that was establishing that channel had no idea in which state it was being established in? Because, Your Honor, I think in the context of this particular case, these machines are in operation for extremely long durations. The machine that's at issue was bought in 2001. The accident was in 2016. Shechtel, by establishing that channel of communication, they are creating a connection between themselves and the consumer that goes around metal forming as the distributor, and it demonstrates a certain intent to interact with their consumer. And you say there is evidence that other Massachusetts customers in fact use those channels of communication? Your Honor, Shechtel is silent in its declaration, in support of its motion to dismiss, about whether it's had direct communications with consumers. We maintain that the channels of communication, the fact that they've established that channel of communication is sufficient. The fact that they identify themselves as the sole contact point for replacement parts, Yes, I understand. I just thought you had told us that, in fact, some other customers had used these channels. In Massachusetts, you don't know one way or the other. We can't know that unless we engage in jurisdictional discovery, but we maintain that the facts are sufficient to demonstrate personal jurisdiction. By establishing, unlike by just selling a product that ends up in a state, by selling a product with also this booklet saying you can contact us back there, that's the kind of plus factor that says, I intend to avail myself of the benefits of the jurisdiction by establishing a relationship wherever it ends up, even though I don't know what state that's going to be. Yes, Your Honor, I agree with that, particularly when you consider the regular flow of products and the identification of Cape Cod Copper on the purchase order. As the ultimate user of this machine, if the machine has a part breakdown, you're not sent to the distributor to replace that part. You're sent to the original manufacturer. Is that what the paperwork says? A consumer who opens the instructions or operations manual to purchase a replacement part will find only the name of Shechtel, the fax, email, and phone number for Shechtel. So that answer is a sort of backdoor way into the answer to the other question. Massachusetts customers did, in fact, contact Shechtel and purchased parts, whether they were replacement parts or whatever. We know that from the volume of sale of the parts. Well, Your Honor, if they were to reach out to Shechtel because Metaforming is the exclusive distributor, Shechtel would presumably have to route that call to Metaforming to complete the purchase. But you have no evidence that it ever happened. On this record, all we know is that they could. We know that they could, that Shechtel would be who they were directed to, and that 234 replacement parts were sold for those 45 machines. Are you giving away something that you don't have to give away at this stage of the record? Because if the documentation says for parts, call the area code for Germany, the country code, then the area code and so forth, wouldn't that direct you to doing that rather than going to the distributor? That would be what I would expect the consumer to do, Your Honor, but I don't want to make presumptions that aren't on the record. So do you allege in any paper that tried to establish personal jurisdiction that there were contacts? We allege that they established the channels of communication and that we would need jurisdictional discovery to know the extent to which consumers contacted them. It is not about exclusion. Well, I guess what I'm trying to... One possibility is that you allege that there were contacts. You could allege that there are contacts and then say that's a plausible allegation given that there was notice to them to contact us in Germany and, in fact, 240 replacement parts were made. Then we'd just say, well, that's plausible inference given what stage of the litigation we're at.  you have not actually alleged that in the record. We make... No, Your Honor, we don't make the allegation that... We don't make that... Well, we don't explicitly make that inference. But you think you don't have to because legally it's enough for you to have simply said that they asked. We know that they established the channels of communications and we provided the information about the number of sales and I think that that inference is made. This machine was 17 years old or thereabouts when the accident occurred. One would assume that in that interim period that something must have broken and something must have had to have been replaced and yet you have made no allegation that you, in fact, in your complaint which is something your client would have known had, in fact, acquired replacement parts and they required them directly from the German manufacturer. Your Honor, we have no way of knowing how the customer ended up at us when they contact us for a replacement part. Whether they call Schectel, explain to Schectel what the issue is pursuant to the instruction in the operation manual and Schectel says, OK, here's who you need to contact to actually purchase. Here's the part you need. And so if we receive that call, we don't know or have record of how they were directed or diverted to us. I see that my time is up. Thank you. Morning, ma'am. Please, the court. I think the questions that your Honor has asked obviously go to the heart of the issue which is let's assume that Schectel didn't know where Cape Cod Copper was. And what this case raises is the issue of a foreign manufacturer selling 45 heavy-duty industrial machines in Massachusetts to a tune of $1.5 million asking the end user to call them if there's any need for spare parts and then claiming that the Constitution protects them from jurisdiction in Massachusetts. And before the district court's ruling in this case, that result would have been unthinkable. We have cited at page 113 of the appendix a string set of dozens of cases involving exclusive distributors. The whole point of the stream of commerce doctrine and the fact that regular course of sales is sufficient to establish jurisdiction is that you can't have manufacturers turning a blind eye to where their products are going. In the Fifth Circuit case you cite, Judge Higginbotham, am I right? I'm not sure which case you're referring to, Your Honor. I thought there was a Fifth Circuit case that you relied on that's of this type. But there, one of the things he says at the end is given that it was chicken poultry and that Mississippi was the fourth largest producer, there was good reason to think they would have known they were selling to Mississippi. But in response to Judge Stahl, when he asked how big a portion of this was Massachusetts, it's 1%. That's true, Your Honor. But in order to believe what Sheckle is saying, that they didn't know where Cape Cod Copper was, you have to believe, and presumably they don't know where any of their customers are. So if that's true, a company... That's the point. Right, exactly. So the point is, unlike that Fifth Circuit case where the court ended up saying they did know where one of the customers were, we have a case in which there's, if you don't know where Cape Cod is, there's nothing in the record that suggests that anything went to Massachusetts. And yet you still want to win. So how under the present can you win in that circuit? Because under Nicastro, under this court's ruling in Plitzer, the regular flow of products here is evidence of an intent to serve the market in and of itself. If you look at any... There is a policy behind this constitutional argument, which is... There's a book case from the Iowa Supreme Court, which we cite, which says, in essence, and I'm not going to read you the quote, but it's not within the contemplation of fairness or due process to allow a manufacturer to use an intermediary or just profess ignorance of where its products are going in order to avoid jurisdiction. But you're now making an argument that doesn't depend on them having included in the materials the material that the end user should contact them. You're just saying the regular distribution would be enough. That's true. Absolutely. Under the Plitzer case that Judge Lynch decided four months ago, the regular course, the regular flow of business to Massachusetts isn't in itself enough. Aren't you on dangerous ground when you give part of your case to, say, the mere fact of a large amount of sales, even if it's 1%, is all you need? That's not the argument you need to make to win the case. My point is I believe under the precedent that is enough, but we don't need to reach that conclusion. What I would be helpful is what is the other thing and why does that other thing matter? The only other thing I've heard is the contact to the end user, wherever they may be, that if they have a problem they should call to the home office overseas. One way I like to look at it is put yourself in the shoes of Cape Cod Copper. They get a machine that's worth tens of thousands of dollars. It comes with all this literature. It has Schecto's name all over it. It says if they have a problem, call us. It has express warranties from the owners of the company. They have an express warranty directly from Schecto to them saying this product is going to meet these specifications. What is that pamphlet if it's not a direct solicitation of business directly to a Massachusetts customer? What is it if it's not that? Call me if you want to buy something from me, but if someone takes their hand off in your machine, please don't call me. That's what the essence of this case is. Isn't your argument basically, look, if I need a spare part, the place I'm supposed to call is the German manufacturer, not the intermediate distributor? That's correct. As I said, we've cited dozens of cases involving intermediate distributors that find jurisdiction constantly. You're aware there's at least some people who are on the higher court taking a somewhat different view of this. There is. And the logic of their position is, and so could you just explain why we should, I realize that there's an argument that we're not bound by those opinions, but if you just explain why they're wrong on the logic and we shouldn't adopt it if we were free to. A forum-specific requirement, if that's what you're talking about, which I think Jay McInerney didn't set, but I understand there's those on the Supreme Court who think that it exists. And the reason is borne out, quite frankly, by this case very well, which is there is a policy here. There is a matter of fundamental fairness that underlies, and we talk about them in the context of gestalt factors, right? Does it really undermine traditional notions of fair play and substantial justice to have checked or answered for Mr. Knox's injuries in Massachusetts? Does the Constitution really protect Schechtel above Mr. Knox in this circumstance, who, according to Schechtel's briefs, has no jurisdiction in the United States to sue Schechtel for the loss of his hand on these facts? And so, yes, there is a fundamental fairness doctrine that is consistent throughout all of the Supreme Court precedent, which says whose rights are we going to enforce here? Thank you. Thank you. Thank you. May it please the Court. My name is Fred Reif, and I represent Schechtel Machine and Biology, MBH. I want to start off by sort of clarifying the record a bit, because Your Honors have heard quite a bit this morning, which is not in the record. What it is in the record is a declaration from Schechtel's CEO, which states that Schechtel has never sold any products into Massachusetts directly. What's in the record is an affidavit from them, for me, saying that they sold spare parts. I'm sorry. How do you have such a volume of parts if nothing ever got sold in Massachusetts? You said directly. Directly. That doesn't get me very far, because you had the distributor. Well, the relationship was as follows, and the distributorship agreement makes this very clear. We, Schechtel, are the designer-manufacturer of the machinery. That machinery is sold FOB Germany, meaning title transfers to metal forming in Germany. The machines are then shipped to Peachtree City, Georgia, and Metal Forming sells them wherever within the territory, which is all of North America, they choose to sell them. Schechtel is not informed whether the end sales happened. Metal Forming's role is more than merely a salesperson. Metal Forming is also responsible for the installation of the machinery on site, for service on site, and for training. That's what Metal Forming's role is. So from Cape Cod Copper's perspective, they never deal with a Schechtel representative. Unless they have a problem with parts? No. If they have a problem with parts, they go to the company that sold them parts. So what about this document that's referenced where Schechtel tells them to contact Schechtel? They're referring to an instruction manual, which comes with every machine. That machine, as pretty much any product in today's day and age, comes with an instruction manual. That instruction manual is not sent by Schechtel to the end user. That manual goes with the machine to Metal Forming. And it tells them if they need a spare part, they should get a hold of the manufacturer. There's nothing in the record that has ever actually happened. Why does that matter? Because the way it was just put to us is that you are communicating to people in North America, individual persons who purchased the product, contact us to do further business with us. That's not what the document says, Your Honor. It does. Your troubleshooting manual says, if it is not possible to correct the malfunction with the aid of the following tables provided by Schechtel, contact the Schechtel Service Department. Then, in another page, it says, Instruction for Inquiries and Spare Part Orders. And then it says, it gives Schechtel as the contact person, company, with the German telephone number. And then, of course, an e-mail. And one doesn't know from an e-mail where something is. So two things. Why aren't those direct channels of communication to the end user? And secondly, why wouldn't we infer from the sale of parts in the absence of specific knowledge about where the inquiries went, that at least some of those inquiries went to Schechtel, who may have sent it back to Metal Forming? Your Honor, with respect to the first question, I would respond by saying that the purposeful availment test, which is really what we're talking about, this is a very narrow issue that's before the court. No, maybe not. I understand the district court didn't reach the other two grounds. But if it was wrong on purposeful availment, then we have to face an issue about whether we should simply address the other prongs of the test rather than remand it. Well, from my perspective, purposeful availment is the cost. Okay. But if we lose on that, then what are we supposed to do? Well, if we lose on that, then we'll... Yeah, and argue to us that we shouldn't just address the other two points and resolve the matter, and either the case goes forward or it doesn't go forward. Well, I mean, Your Honor, my point is that purposeful availment from our perspective is the issue, and if we lose on purposeful availment, then there's no reason to go back on the other issues to the district court. Okay. So from our perspective, you know, we're not here to argue that the long-run statute doesn't apply. We're simply making the point that the district court judge found exactly on point that the purposeful availment test was not met here. That's because purposeful availment requires a voluntary action by the foreign defendant. In this case, if Shechtel had reached out to Massachusetts companies, if Shechtel had directly reached out to Peacock Copper... It did. It did not. Through the instruction manual. No, but it didn't do that directly. It had no control over where metal forming is sent to those instruction manuals. It printed instruction manuals. They were included with machines. They were sent to... If it published an ad in the Wall Street Journal, please do business with Shechtel, and somebody in New York reads the Wall Street Journal, does that count or not count under your theory? It's not state-specific, Your Honor. I know, but does it count or not count? It doesn't count. I mean, it has to be state-specific. Under Justice Breyer's concurrent opinion in McIntyre, which is the controlling opinion because it's the one decided on scenarios grounds, there's basically a two-part test here. And this is basically just a recitation of Justice O'Connor's prior decision in Asahi. And that is, first of all, there has to be a regular flow, a regular course of sales into the foreign state. So we can debate whether 45 machines over 15-plus years is a regular flow or not, but that's not really the issue. The second prong of the tests articulated by Justice Breyer is an important one, and that is there has to be something more. That is the same as Justice O'Connor's stream of commerce plus. Well, isn't there something more, the direction that if you have a problem, call us? Because if I'm looking at the manual, and it says call the German code and the number for instructions, wouldn't that be the thing I would do? Because that's what the manual tells me to do. But that was not the result of any voluntary actions on the part of Justice O'Connor. Oh, yes, it was because it's packaged with the machines with the intention that the end user get these instructions that go with the machine. You've attempted an argument, which makes no sense to me, that metal forming had two things. They had the machine and then they had the instructions, and it was metal forming's decision to send the instructions along with the machine, and that had nothing to do with Schecto. Are you really seriously arguing that? Well, what I'm arguing, Your Honor, is it was metal forming's decision on where to sell the machines, and that the user manual goes with every machine regardless of where it's sold. But that state-specific targeting requirement is not in Justice Breyer's opinion. It is, Your Honor. In the section where he describes and tests the recitation, he basically says that the something more is state-specific designs, state-specific advertising advice, and so forth. Does he say state-specific? Yes, he does. I don't have the opinion in front of me, Your Honor. I do have the Plixer thing where it's cited. That's the point. The point is that the test in McIntyre, and this is basically a McIntyre case, the only real difference between this case and McIntyre is the volume of sales that were made in some form state. There's no discussion in McIntyre about the user manuals for that machine. No, what he says is, here the relevant facts found by the New Jersey Supreme Court show no regular flow or regular course of sales to New Jersey. I understand you say that's debatable. And there is no something more, such as special state-related design, comma, advertising with no state-related or state-specific modifier, advice with no state-related or state-specific modifier, marketing with no state-specific or state-related modifier, or anything else. So it's not in Breyer's opinion. In fact, if anything, unless you read state-related to carry over as the modifier for every one of those words. I mean, that's the logical way to read it, Your Honor, because otherwise any advertising anywhere in the world would satisfy Justice Breyer's test. Why would that make no sense? Because if advertising, for example, advertising and advice for taking... See, the idea is when you have a distributor, the distributor can just send it anywhere and I have no control over that. Now, if I design something that's state-related and I give it to the distributor, I can't very well say I didn't know where the distributor was going to send it. So it makes sense to stay state-related there. But now if we're talking about advertising, that's not the distributor doing it, that's me doing it, directly. And the fact that I chose to only spend my money wisely on the New York Times rather than Albany Journal shouldn't exempt me from being responsible for the person who purchased it in New York, just because I happen to choose a national newspaper. Because it would be kind of crazy to think that I could only... At risk if I choose the local newspaper and I've got to do the local newspaper in all 50 states. Why would one require that? Well, the Supreme Court has required that the contacts be directly towards the forum. So national advertising wouldn't satisfy that requirement. And I certainly read Justice Breyer's language as that modifier carrying over into the remainder. So there's also a more recent decision from the Supreme Court, the Bristol-Myers-Squibb decision from 2017, which is actually a different case, but it is the most recent recitation by the U.S. Supreme Court of the state of case law regarding a specific jurisdiction. And it basically goes through all these cases, including the Asahi case, including the McIntyre case, and recites the same things and emphasizes, in that case it emphasized that the primary concern for jurisdiction purposes is the burden on the defendants. And that for purposeful availment purposes, the activities have to be directed at residents of the foreign state. So in the case of advertising, a general advertisement in the New York Times or whatever is not directed at Massachusetts. Well, your position is, isn't it, that there's no way that your client can be subject to suit anywhere in the United States? That's not my position, Your Honor. Let me give you an example. If there were an accident in the state of Georgia, where Metalphorne is located, we have a regular business relationship with Metalphorne. Clearly, an argument can be made that for that case, Sheckler would be subject to personal jurisdiction in Georgia because it has a regular business relationship with Sheckler. How about the other 49? Yeah, how about the rest of the country? The rest of the country, the relationship that's been structured with Metalphorne is one where an injured plaintiff has a remedy. The injured plaintiff in this case has a remedy against Metalphorne. And Metalphorne is a company that's submission. And Metalphorne then has a remedy against Sheckler. And Metalphorne contracted to resolve all disputes between Metalphorne and Sheckler in Germany under German law. Well, let me ask you this. Let's assume that Metalphorne goes out of business and Sheckler brings in a new distributor. What would that customer in Massachusetts have to do in order to replace parts? He would go to Sheckler, would he not? Because that's what he was told to do. And I assume that the only place he would have anybody that he could go after would be Sheckler. Well, under that scenario, the hypothetical scenario. What's a hypothetical? Well, under that scenario, in that case, Sheckler would then be responding directly to the Massachusetts customer and be selling directly to Massachusetts. And that would completely change the jurisdictional analysis. But it doesn't change what the documents which Sheckler sent out tells the customer. It's the same document. It says if you need parts, if you need help, call us. But again, those documents were not distributed by Sheckler to the end users. They were distributed by Metalphorne. Judge Barron has a question. I take your point. I guess it's just a question of whether Brett as a whole, Justice Breyer's opinion makes sense, if you carry through that state-related, because why is he writing separately from Justice Kennedy if it's got to be targeted in all those things? But I have one point you raise, which I want to make sure I understand, because I think it goes to how significant this case might be. Is there a way to distinguish the type of communications Sheckler made through the instruction manual from national advertising? Yes, national advertising requires, I guess, an entity to voluntarily place into the general domain a business solicitation or other advertising to try to attract business. That's not what happens here. Why is this different in a way that would be, if we were disinclined to say that national advertising is not a plus factor, why is this different? What are the features, given if we accept that what the document says is Sheckler would like to do further business with you, and we accept that Sheckler is responsible for it being packaged with the product? Well, Sheckler's responsible for it being delivered to the end user with, I'm sorry, Sheckler's responsible for it being delivered with a machine to Melliformy. Melliformy is then responsible for disseminating that information to whoever Melliformy sends it to. So the difference is that there's no control, on the part of Sheckler to focus on potential customers in Massachusetts, actual customers in Massachusetts, customers of Melliformy. They can't be caught to purchase this machine from Melliformy and not from Sheckler. I think that would be my response to that. Okay. Thank you. Thank you. So I'd like you to answer, before your minute starts, the question that Judge Barron just asked. It has implications for both of you. Is the inclusion of these booklets with the instructions to contact Sheckler directly into the packet with the machine so when it's delivered the end user will get both, is that different from national advertising? Your Honor, I don't believe that it is. I would have thought you would have said, well, even if national advertising isn't enough, this is. I do agree with that, Your Honor, but I don't think it's different. You say it's at least as good as national advertising if national advertising counts, and if it doesn't count, it's better than national advertising. Well, national advertising that reaches consumers in the foreign state, and this is circulated to all consumers and reaches consumers in the foreign state, so I think it's on par from that perspective. In this particular case, I think it is more pertinent because, whereas national advertising solicits purchases, this solicits an ongoing relationship with consumers that can last over multiple decades. You may just respond. If I take the point that was made by your opposing counsel, the idea would be something like when I consciously choose to do national advertising, I have consciously reached out to all those people in all those places. When I consciously choose to include the instruction manual with the distributor, I have made no conscious choice about where any of it should go, any more than I have chosen where the product itself should go. They just travel together, so it's the distributor who's choosing where to send it, so I haven't made a conscious decision to reach out to any person in any particular jurisdiction. But that's a flawed argument in this particular case, Your Honor, because the manufacturer contracted with the distributor and determined what the territory into which they would distribute is, so they control the territory. If they want to exclude their manuals and operation instruction manuals from going to a forum, then take that forum out of the territory into which the distributor can sell its products. I would have thought your other answer was they retain the power to reject the purchase orders. Sure. And they chose not to reject it here. Exactly, Your Honor. They had the information necessary to determine that their product was going to this Massachusetts consumer and could have, based on that determination, could have rejected the purchase order, and they didn't do so. So you're helped a little bit by the name of the end user being Cape Cod, which most people understand in geographic terms. But suppose it hadn't been that. Suppose it was just a metal folding company. Sure, Your Honor. I think it's the same result. The idea is that based upon the identification of the purchaser, they had the tools to identify their location. Your inquiry notice argument. I'm sorry, Your Honor? Your inquiry notice argument. Exactly, Your Honor. But that makes it just as broad as the argument that we were first hearing, and the issue of the instruction manual being there becomes irrelevant. Yes. No, I don't think so, Your Honor. To respond also to your earlier question about the Ainsworth case, Ainsworth involved the sale over 10 years into Mississippi of 1.55% of the manufacturer's sales. We're dealing with a greater percentage in this case. But there, what he says at the end is the fourth largest poultry state is Mississippi, and so anybody trying to get market share would have thought they were after Mississippi. But the overall sales into Mississippi were actually less than the percentage of sales in Massachusetts. Yes. The fact that you're an ineffective salesman doesn't mean that you weren't intending to reach those customers. Well, Your Honor, I would also point you to the Byrd decision from the Sixth Circuit, where the plaintiff in that case simply took the national sales, divided it by 50, and the Sixth Circuit in that particular instance found that that was sufficient of, you know, a free flow of a regular course of sales into the farm state. If there's nothing further, thank you. Mr. Reif, do you feel the need to say anything to us in response to the rebuttal that was just given? Your Honor, I just wanted to point out, as the Court is aware, the Plixer case, which has previously been mentioned by opposing counsel, is obviously not relevant here. That was a due process Fifth Amendment case, federal question, as opposed to what we have here. That's all I wanted to add. Okay. Thank you. Thank you. Thank you both.